Kristine M. Akland
Akland Law Firm, PLLC
317 E. Spruce St.
P.O. Box 7274
Missoula, MT 59807
aklandlawfirm@gmail.com
Telephone: (406) 544-9863

Nicholas M. Arrivo
The Humane Society of the United States
1255 23rd S. NW, Suite 450
narrivo@humanesociety.org
Telephone: (202) 676-2339
Application for admission *pro hac vice* pending

Counsel for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES and THE FUND FOR ANIMALS <br> *Plaintiffs* <br> v. <br><br> U.S. FISH AND WILDLIFE SERVICE, an agency of the Department of Interior, <br><br> U.S. DEPARTMENT OF THE INTERIOR, <br><br> RYAN ZINKE, Secretary of the Interior, <br><br> GREG SHEEHAN, Acting Director of the U.S. Fish and Wildlife Service, and <br><br> JIM KURTH, Deputy Director of the U.S. Fish and Wildlife Service, <br> *Defendants* | CV- <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.    In 2015, grizzly bears in the Greater Yellowstone Ecosystem ("GYE") suffered a record number of human-caused mortalities. That year, humans struck with vehicles, poached, or "lethally controlled" fifty-eight bears (more than five percent of the population), constituting nearly all of the deaths of bears recorded in the GYE. This surpassed, by wide margins, the previous records for both overall mortality (2012) and human-caused mortality (2010).

2.    The trend continued in 2016, when human-caused grizzly bear deaths totaled fifty-three, once again accounting for more than ninety percent of the year's total mortality and destroying more than five percent of the population. This stands second only to 2015 as the deadliest year for GYE grizzly bears since recordkeeping began in 1959.

3.    Against the backdrop of nearly a decade of steady increases in grizzly mortality – culminating in these two consecutive years of staggering, record-breaking numbers of dead grizzlies – the U.S. Fish and Wildlife Service ("FWS") has stripped federal Endangered Species Act ("ESA") protection from this vulnerable population of fewer than 700 bears precisely when it is most needed. *See* 82 Fed. Reg. 30502 (June 30, 2017).

4.     This Court vacated the FWS' prior attempt to delist GYE grizzly bears in a 2009 opinion upheld by the Ninth Circuit in 2011. In that case, Judge Molloy admonished the government for failing to consider the impact of the precipitous loss of whitebark pine – the nuts from the trees are a staple food for the GYE grizzly population – in and around Yellowstone National Park. Yet the FWS' 2017 decision to remove GYE grizzly bears from the list of threatened species ("Final Rule") again fails to adhere to the best available science regarding the direct and indirect impacts to GYE grizzlies caused by diminished food availability.

5.     The Final Rule downplays the consequences of the ongoing decline of whitebark pine and other staple foods by emphasizing grizzly bears' adaptable and omnivorous diet. The FWS failed to consider the collateral consequences from the recent expansion of bears ranging beyond Yellowstone and Grand Teton National Parks to obtain alternative food: chiefly, increasing contact and conflict with humans, their property, and their cars. The Final Rule fails to acknowledge that the trends of declining staple foods and rocketing human-caused mortality are closely linked, despite ample scientific evidence in the administrative record supporting that causal connection.

6.     The Final Rule not only ignores the demonstrated reasons for rising human-caused grizzly bear mortality, but also opens the door to a new threat to the species' survival: trophy hunting. The Final Rule replaces the robust protections of the federal ESA with woefully inadequate and legally impotent state management plans that allow for unsustainable trophy hunting for grizzly bears in Wyoming, Montana, and Idaho as soon as this fall. Management under state laws and regulations – none of which meet the standards explicitly set by the FWS itself when it proposed delisting – threatens to reverse decades of conservation efforts and put GYE grizzly bears back on the brink of extinction.

7.     The harm to grizzly bears inflicted by the Final Rule does not stop at the arbitrary boundary of the GYE Distinct Population Segment ("DPS"). By carving the GYE population out of the previous grizzly bear listing, which treated all grizzly bears in the lower 48 states as a single threatened entity, the FWS has misused the ESA's DPS provision and left the legal status of the remaining grizzly bears in doubt. The FWS also failed to consider the impact that removing federal protections from the GYE population may have on the other grizzly bears, whose prospects of establishing genetic connectivity with bears in the GYE are now all but foreclosed.

8.      Therefore, Plaintiffs – two animal protection organizations with a long

history of advocating for grizzly bear protection – bring this lawsuit under

the Endangered Species Act and Administrative Procedure Act ("APA") in

order to ensure that GYE grizzly bears continue to receive federal

protection unless or until the best available science supports a conclusion

that this population has recovered, as required by law.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action pursuant to the ESA's citizen suit provision, 16

U.S.C. § 1540(g), and the APA, 5 U.S.C. §§ 702, 704. This Court has

jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under

United States law. Plaintiffs sent the Secretary of Interior notice of their

intent to sue over ESA violations more than 60 days prior to the

commencement of this litigation.

10.     Venue is proper in this judicial district because a substantial part of the

events giving rise to these claims occurred and continue to occur in

Montana, including the decision to remove federal protections for grizzly

bears in the GYE, the presence of GYE grizzly bears and the GYE itself,

and injury to Plaintiffs and their members. *See* 28 U.S.C. § 1391(e)(1); 16

U.S.C. § 1540(g)(3)(A). This case is properly assigned to the Missoula

Division because Defendants maintain a field office focused on grizzly

bear recovery in Missoula and this case is related to a case recently filed in this Court. *See Crow Indian Tribe et al., v. U.S. et al.,* Case No. 9:17-cv-00089-DLC-JCL.

## PARTIES

11.   Plaintiff The Humane Society of the United States ("HSUS") is a non-profit charitable organization incorporated in 1954. HSUS is the nation's largest animal protection organization, with millions of members and constituents. HSUS' mission is to promote the humane treatment of animals and to foster respect, understanding, and compassion for all creatures. HSUS has shown particular interest in endangered and threatened species, and supports efforts aimed at the protection and recovery of such species and their habitats. HSUS regularly submits comments to government agencies concerning proposed actions that would affect wild animals. HSUS publishes a magazine and maintains a website for its members and the general public, and it regularly disseminates information concerning humane management of wild animals, including government decisions that affect wildlife. HSUS has long been an active advocate for grizzly bear protection and recovery. HSUS' members enjoy studying, photographing, and viewing wildlife in their natural habitat, including grizzly bears. HSUS members have repeatedly tracked and

sighted individual GYE grizzly bears to learn about their behavior, social relationships, and role in the ecosystem, both for professional development and personal enjoyment, and these members place great importance on their ability to appreciate bears in the wild. HSUS' members have thus attended meetings of state and federal agencies and other interested parties concerning grizzly bear management.

12.     Plaintiff The Fund for Animals ("the Fund") is a national nonprofit membership organization founded in 1967. The Fund is a wildlife protection organization that engages in advocacy campaigns, rescue operations, and direct care for animals at several accredited wildlife sanctuaries around the country. The Fund and its over 350,000 members and supporters are committed to preserving animal and plant species in their natural habitats, and preventing the abuse and exploitation of wild and domestic animals. As part of its mission, The Fund seeks to educate its members and the public concerning the treatment of animals and government actions that impact animals, including grizzly bears. The Fund has been involved in wildlife protection efforts for over four decades and participated in the advocacy efforts that led to the passage of the ESA.

13.    The plaintiff organizations and their members are deeply committed to

       grizzly bear conservation and have long-standing interests in the

       preservation and recovery of the species in the GYE. Plaintiffs place a high

       value on the grizzly bear as a species and because the bears play a vital role

       in maintaining healthy ecosystems in the region. Plaintiffs seek to protect

       and recover grizzly bears through a wide range of actions including public

       education and advocacy. Members of the plaintiff groups seek to view

       grizzly bears and signs of grizzly bears in the wild throughout the GYE,

       including specific bears they have come to recognize. Implementation of

       the Final Rule will result in the death of several hundred grizzly bears, and

       fewer grizzly bears within the region will reduce Plaintiffs' members'

       opportunities to experience viewing grizzly bears in the wild, and will

       cause harm to the ecosystems throughout the GYE.

14.    Because the Final Rule will reduce Plaintiffs' opportunities to experience

       and enjoy grizzly bears (including bears specifically found within the

       GYE) and the habitats upon which they depend, the legal violations alleged

       in this Complaint cause direct injury to the aesthetic, conservation,

       recreational, scientific, educational, and wildlife preservation interests of

       the plaintiff organizations and their members. Plaintiffs' aesthetic,

       conservation, recreational, scientific, educational, and wildlife preservation

8

interests have been are being harmed, and unless their requested relief is granted, plaintiffs will continue to be adversely and irreparably injured by the FWS' failure to comply with federal law. These are actual, concrete injuries, traceable to the FWS' conduct that would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

15.    Defendants the United States Department of the Interior, the United States Fish and Wildlife Service, Secretary of the Interior Ryan Zinke, Acting Director Greg Sheehan, and Deputy Director Jim Kurth are charged with the administration of the ESA. The defendants are responsible for ensuring the protection and recovery of species listed as endangered or threatened under the ESA. Individual defendants are sued in their official capacities.

## LEGAL FRAMEWORK

### The Endangered Species Act

16.    In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). Accordingly, a primary purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." *Id.* § 1531(b). The ESA defines "conservation" as "the use of all methods and

procedures which are necessary to bring any endangered or threatened species to the point at which" the ESA's recovery procedures are no longer necessary. *Id*. § 1532(3).

17. Under the ESA, the Secretary of the Interior, acting through the FWS, must list all species determined to be "endangered species" or "threatened species." *Id*. § 1533(c)(l).

18. The Act defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6). Similarly, the Act defines a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

19. The ESA defines a "species" to include only the species as a whole and "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

20. In making listing decisions, "a portion of the range of a species is 'significant' if the species is not currently endangered or threatened throughout all of its range, but the portion's contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the

foreseeable future, throughout all of its range." 79 Fed. Reg, 37577, 37579 (July 1, 2014).

21.     Under Section 4 of the ESA, the FWS must list a species if the agency determines that the species is endangered or threatened due to any of the following factors:

> A. the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> B. overutilization for commercial, recreational, scientific, or educational purposes;
>
> C. disease or predation;
>
> D. the inadequacy of existing regulatory mechanisms; or
>
> E. other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(l); 50 C.F.R. § 424.11(c) (hereafter referred to as the "five listing factors"). The presence of any one of the five listing factors is a sufficient basis on which to list a species.

22.     Listing decisions under the ESA must be based solely upon "the best scientific and commercial data available." 16 U.S.C. §§ 1533(b)(l)(A), (c)(2); 50 C.F.R. § 424.11(b), (d).

23.     Once a species is listed, it enjoys the substantial protections of the ESA. For example, the ESA strictly prohibits the "take" of endangered species.

16 U.S.C. § 1538(a)(1). Further, to facilitate species recovery, the ESA directs the FWS to "develop and implement" detailed "recovery plans" for listed species, unless such a plan would "not promote the conservation of the species." 16 U.S.C. § 1533(f). Each recovery plan shall include, to the "maximum extent practicable," (a) a "description of such site-specific management actions" necessary for the conservation and survival of the species, *id.* § 1533(f)(1)(B)(i); and (b) "objective, measurable criteria" that, if satisfied, would support delisting. *Id.* § 1533(f)(1)(B)(ii).

24.   In addition, the ESA requires all federal agencies to further the purposes of the ESA by "carrying out programs for the conservation of endangered species and threatened species" and mandates that every federal agency, relying on "the best scientific and commercial data available," ensure its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." *Id*. § 1536(a)(1), (2).

25.   Once listed as "endangered" or "threatened," a species can only be delisted if the best available scientific and commercial data indicate that it is no longer endangered or threatened because it is extinct, because it has recovered, or because the original listing decision was in error. 16 U.S.C. § 1533(c)(2)(B); 50 C.F.R. § 424.11(d).

26.    Decisions to delist or reclassify an already-listed species are governed by

the same five-factor analysis as when listing a species. A species has not

recovered, and cannot be delisted, "until the threats to the species as

analyzed under [the five listing factors] have been removed." 51 Fed. Reg.

19,926, 19,935 (June 3, 1986).

The Distinct Population Segment Policy

27.    The ESA broadly defines a "species" to include "any subspecies of fish or

wildlife or plants, and any distinct population segment of any species of

vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. §

1532(16).

28.    Under this definition, the FWS can list a distinct population segment

("DPS") of a vertebrate species, even when the species as a whole is

neither endangered nor threatened. 16 U.S.C. § 1532(16). As recognized in

the FWS' and National Marine Fisheries Service's 1996 Policy Regarding

the Recognition of Distinct Vertebrate Population Segments Under the

Endangered Species Act (61 Fed. Reg. 4722 (Feb. 7, 1996) ("DPS

Policy")), Congress envisioned that DPS designations would be used to

protect locally vulnerable populations of species that are otherwise

abundant. Specifically, by extending the protections of the ESA to locally

vulnerable populations, the DPS designation is intended to be used by the

13

FWS to "protect and conserve species and the ecosystems upon which they depend before large-scale decline occurs that would necessitate listing a species or subspecies throughout its entire range."61 Fed. Reg. at 4725.

29.   Whenever the DPS tool is used, it "should be aimed at carrying out the [conservation] purposes of the [ESA]." *Id*.

30.   The DPS designation also should be used only "'sparingly and only when the biological evidence indicates that such action is warranted.'" *Id*., quoting Senate Report 151, 96th Congress, 1st Session.

31.   Under the DPS Policy, the FWS must consider three elements in any DPS decision:

> a. The discrete or separate nature of the population segment in relation to the remainder of the species to which it belongs;
>
> b. The significance of the population segment to the species to which it belongs; and
>
> c. The population segment's conservation status as measured by the ESA's five listing factors.

*Id*. at 4725.

32.   A population segment is "discrete" if it is either:

a. Markedly separated from other populations of the same species because of physical, physiological, ecological, or behavioral factors, including consideration of genetic or morphologic differences; or

b. Delimited by foreign borders, with differences between the countries with respect to exploitation, management of habitat, conservation status, or regulatory mechanisms that are significant in light of the ESA's consideration of those mechanisms.

*Id.*

33.   Based on the mandate to use the DPS tool only "sparingly," the "significance" prong is evaluated *only* if discreteness is established. The significance of a population segment is determined by an evaluation of relevant factors, including but not limited to the following:

a. Persistence of the discrete population segment in an ecological setting unusual or unique for the taxon;

b. Evidence that loss of the discrete population segment would result in a significant gap in the range of a taxon;

c. Evidence that the discrete population segment represents the only surviving natural occurrence of a taxon that may be more abundant elsewhere as an introduced population outside its historic range;

d. Evidence that the discrete population segment differs markedly

from other populations of the species in its genetic characteristics.

*Id.*

34.     Only if "discreteness" and "significance" are established can the FWS

move to the next step, which involves consideration for protected status

utilizing the five listing factors. To determine the conservation status of the

DPS, the DPS must be evaluated "for endangered or threatened status. . .

based on the Act's definition of those terms and a review of the [five listing

factors]." *Id.*

35.     The factors on which the DPS analysis must be based – discreteness,

significance, and conservation status – show that the DPS tool is primarily

designed to be a means of adding ESA protections to one population of an

otherwise unprotected species, and not a means of eliminating those

protections.

The Administrative Procedure Act

36.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553-59, 701-06,

provides for judicial review of final agency action such as the Final Rule.

37.     Under the APA, a reviewing court must hold unlawful and set aside agency

action, findings, and conclusions found to be arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law. 5 U.S.C. §

706(2)(A).

38. The APA also provides that whenever an agency decides to "formulat[e],

amend[], or repeal[] a rule," it must first publish a public notice setting

forth "either the terms or substance of the proposed rule[,] or a description

of the subjects and issues involved." *Id.* §§ 553(b), 551(5).

39. Although public notice of a rule "need not specify every precise proposal

which [the agency] may ultimately adopt," it "must be sufficient to fairly

apprise interested parties of the issues involved." *Nuvio Corp. v. FCC,* 473

F.3d 302, 310 (D.C. Cir. 2006). The dispositive question in assessing the

adequacy of notice under the APA is whether an agency's decision is a

"logical outgrowth" of an earlier request for comment. *Long Island Care at*

*Home, Ltd. v. Coke,* 551 U.S. 158, 174 (2007).

## FACTUAL BACKGROUND

### Grizzly Bear Biology

40.     Grizzly bears (*Ursus arctos horribilis*) are the second-largest carnivore in

        North America, with their distinctive humped backs making them nearly as

        large as polar bears.

41.     Historically, grizzly bears ranged from northern Mexico to Canada and

        Alaska, with a population of approximately 50,000 living in the lower 48

        states in the early 1800s.

42.     The species was largely extirpated from the lower 48 states by the 1920s

        and 1930s, due to hunting and habitat loss, shrinking that population to

        fewer than 2,000 grizzly bears remaining today in the northern Rocky

        Mountains.

43.     By 1975, the population of grizzly bears in the GYE dwindled to 136 and

        to fewer than 1,000 bears across the lower 48 states, triggering the FWS to

        list the subspecies as threatened with extinction across its range in the

        lower 48 states. *See* 40 Fed. Reg. 31734 (July 28, 1975).

44.     While, according to the FWS, grizzly bears in the GYE now number

        between 600-747 (average 674 bears), the species has not fully recovered

        across its current range, from Washington to Idaho, Montana, and

        Wyoming.

45.     The GYE grizzly bear population lives in and around Yellowstone National

        Park, Grand Teton National Park, National Forest land, and other public

and private land in Wyoming, Montana, and Idaho. However, there is insufficient connectivity between GYE grizzly bear habitat and habitat further north in the range of the lower 48 listing entity (the Northern Continental Divide and Cabinet Yaak Ecosystems in Montana, the Bitterroot and Selkirk Mountains Ecosystems in Idaho, and the Northern Cascades Ecosystem in Washington).

46.    Grizzly bears are omnivorous, foraging across large home ranges (approximately 70 square miles for adult females and up to 500 square miles for adult males) to consume enormous amounts of seasonal foods.

47.    Grizzly bears in the GYE have historically relied on eating whitebark pine seeds, cutthroat trout, and army cutworm moths as staple foods; however, in recent years the decimation of these food sources have caused grizzly bears to increasingly roam outside of the National Parks in the GYE in search of novel food sources.

48.    When grizzly bears are forced to constantly move in search of food – as they increasingly are as a result of habitat loss, climate change, drought, invasive species, and other anthropogenic and natural causes – it decreases the bears' fitness and puts them in increased danger of conflict with humans and other large carnivores.

49.     In addition to threats grizzly bears face from conflict with landowners, the
        social structure and life cycle of grizzly bears make them particularly
        sensitive to hunting mortality. As large-bodied carnivores they are only
        sparsely populated across vast areas; they invest in few offspring; they
        provide extended parental care to their young; and social instability
        undermines their resiliency, given the risk of infanticide when a large male
        bear is killed for a trophy and younger males move in to take over territory.

50.     Because of these factors, hunting mortality of grizzly bears is not
        compensatory like in traditional game animals such as deer and elk (where
        hunting can decrease natural mortality and increase reproduction, leading
        to population growth). Rather, hunting mortality of grizzlies is *super-
        additive* or *multiplicative*, whereby increased hunting causes increased
        natural mortality (infanticide) and decreased reproduction (sexual
        segregation), leading to population decline.

        The FWS' Previous Attempts to Reduce Protections for GYE Grizzly Bears

51.     Following the 1975 threatened listing for the grizzly bear subspecies in the
        lower 48 states (which continues to be in effect), the FWS was required to
        establish a recovery plan to save the species from the brink of extinction.
        Over the following two decades, wildlife conservationists, including the
        Fund, urged the FWS (against the agency's resistance) to establish science-

based mechanisms for securing the continued survival of grizzly bears in the lower 48 states.

52.   In 1993, the FWS issued a Grizzly Bear Recovery Plan, but failed to adequately set forth site-specific management actions or objective criteria for measuring the success of the plan. The Fund and other wildlife protection organizations filed a lawsuit challenging the sufficiency of the 1993 Plan and entered into a settlement agreement in 1995 that required the FWS to establish habitat-based criteria for the Grizzly Bear Recovery Plan. *See Fund for Animals v. Babbitt*, 903 F. Supp. 96 (D.D.C. 1995).

53.   Through the next decade, the FWS worked to establish experimental populations of grizzly bears and to develop a Conservation Strategy, while conservation groups, including the Fund, petitioned the agency to reclassify certain populations of grizzly bears from threatened to endangered (which the FWS agreed was warranted but precluded for the Cabinet-Yaak ecosystem). *See* 64 Fed. Reg. 26734 (May 17, 1999).

54.   In 2007, the FWS finalized a rule removing ESA protections for grizzly bears in the GYE despite ongoing declines in staple food sources, habitat loss, and lack of genetic diversity.  Multiple conservation groups successfully challenged that Final Rule as violating the ESA, and in 2009 this Court vacated the rule, a decision upheld by the Ninth Circuit in 2011.

*Greater Yellowstone Coal. v. Servheen*, 672 F. Supp.2d 1105 (D. Mont.

2009), *aff'd in relevant part by Greater Yellowstone Coal. v. Servheen*, 665

F.3d 1015 (9th Cir. 2011).

55.    In 2013, the FWS amended the Grizzly Bear Recovery Plan that paved the

road for removing protections for grizzly bears in the GYE, despite the lack

of connectivity with other populations and significant threats to the survival

of grizzly bears in the GYE.

<u>The 2016 Proposed Grizzly Bear Delisting Rule</u>

56.    On March 11, 2016, the FWS issued a proposed rule establishing the

Greater Yellowstone Ecosystem DPS and simultaneously removing grizzly

bears in the GYE DPS from the list of threatened species. *See* 81 Fed. Reg.

13174 (March 11, 2016) ("Proposed Rule"). The Proposed Rule was also

accompanied by a Draft Conservation Strategy and a draft supplement to

the Grizzly Bear Recovery Plan, which purported to include comprehensive

post-delisting management plans for the subspecies.

57.    On May 10, 2016, plaintiff HSUS submitted comments in opposition to the

Proposed Rule, asserting that the it failed to comply with the ESA on both

procedural and substantive grounds.

58.    HSUS asserted that the FWS violated the ESA and the DPS Policy when it

established the GYE DPS solely for the purpose of eliminating protections

for that population, arguing that the FWS may not delist GYE grizzly bears until such time as the best available science supports (a) designation of multiple grizzly bear DPSs that encompass the entire range of the currently listed subspecies; and (b) subsequent delisting of a grizzly bear DPS after that DPS meets established recovery goals and no longer is threatened by any of the five listing factors.

59.  HSUS also provided ample scientific support contradicting the threats analysis the FWS conducted, eviscerating the FWS' claims that GYE grizzly bears are no longer threatened by habitat loss, habitat modification, overutilization for commercial and recreational purposes, and inadequate state regulatory mechanisms.

60.  Of primary concern, HSUS detailed why the FWS' claims that grizzly bears are "extremely omnivorous," "display great diet plasticity," and can consume "over 260 species of foods" (Proposed Rule at 13177-78), is an overly optimistic conclusion. To the contrary, the best available science shows that GYE grizzly bears are facing a catastrophic food crisis that threatens their continued existence, but the Proposed Rule misinterpreted grizzly bears' shift toward non-staple food sources as evidence of grizzly bears' capacity to adapt when, in fact, reliance on these undependable new food sources puts GYE grizzly bears at greater risk than ever.

61.     HSUS submitted copious scientific support showing that whitebark pine

        seeds, native cutthroat trout, and army cutworm moths – staple foods that

        GYE grizzly bears have relied on for decades – are either in decline, or are

        expected to decline for the foreseeable future, as a result of habitat loss,

        climate change, drought, invasive species, and other anthropogenic and

        natural causes. Indeed, the FWS itself has made a formal finding that

        whitebark pine warrants federal ESA protection. *See* 76 Fed. Reg. 42631

        (July 19, 2011).

62.     Regarding the disappearance of staple food sources (a type of habitat loss

        and modification), HSUS' comments rebutted the FWS' incorrect claims

        that cutthroat trout – which share the same habitat as the bears – were never

        an important grizzly bear staple; criticized the FWS' analysis – based only

        on a single source – that alpine tundra will not be adversely affected by

        global warming and that army cutworm moths will somehow quickly learn

        to adapt; and showed that the FWS failed to consider the demonstrated time

        lag for the impact of loss of huckleberries on grizzly bear populations.

63.     HSUS also provided scientific support undermining the FWS' claim that

        grizzly bears have reached their carrying capacity in the primary

        conservation area ("PCA") of the DPS and are therefore expanding their

        territory. To the contrary, HSUS' comments showed that since the bears

have lost their historic food sources they are now relying more on wild and

domesticated hooved animals (like elk and livestock) that necessitate the

bears' movement across a larger range, while simultaneously putting them

in closer proximity to humans, wolves, and other territorial male bears,

resulting in greater conflicts and higher mortality.

64.   HSUS' comments further made clear that the best available science shows

that a secure core habitat would need to be *seventy-two times* larger than

the four hectares used by the FWS to establish the PCA in order to

adequately prevent human-bear or bear-livestock conflicts. Additionally,

HSUS argued that in the lands outside of the Demographic Monitoring

Area ("DMA," where state wildlife agencies will monitor the grizzly bear

population post-delisting), bears will not be counted toward population

objectives or discretionary mortality limits and will be subjected to

potentially unmitigated persecution. This will eliminate the opportunity for

dispersing bears to connect the GYE population to other populations in the

lower 48 states, as needed to maintain genetic diversity and prevent genetic

drift and inbreeding depression within and outside of the GYE.

65.   Moreover, HSUS asserted that the Proposed Rule failed to comply with the

ESA's requirements that delisting only occur if there are adequate existing

regulatory mechanisms in place to ensure the continued survival of grizzly

bears in the event of delisting. Specifically, HSUS provided ample scientific evidence of the negative cascading impacts of removing large adult males from the population, as proposed by a tri-state Memorandum of Agreement ("MOA") whereby the states of Wyoming, Montana, and Idaho are free to authorize trophy hunting within the DMA.

66.   HSUS' comments also included scientific evidence demonstrating that permitting hunting of female bears as young as two years of age, as authorized by the MOA, would be insufficient to protect the population's capacity to reproduce.

67.   In September 2016, the FWS reopened a comment period on the Proposed Rule, asserting that Montana, Wyoming, and Idaho had finalized regulations managing human-caused mortality of grizzly bears and announcing the availability of five peer reviews of the Proposed Rule. 81 Fed. Reg. 61658 (Sept. 7, 2016) ("Supplemental Notice").

68.   The Proposed Rule correctly emphasized the importance of protections enshrined by state "law and regulation" that are "legally binding" and "enforceable" in its discussion of the adequacy of state regulatory mechanisms. 81 Fed. Reg.  at 13210-11. HSUS' supplemental comments (submitted on October 7, 2016) asserted that the FWS failed to comply with these commitments by relying on the mere promise of future state

regulatory mechanisms that were not yet in place or did not carry the force of law.

69.     Specifically, the Supplemental Notice asserted that two mechanisms sufficed to ensure adequate state-level protection of grizzly bears in Montana: the "Grizzly Bear Hunting Regulations" and the MOA. 81 Fed. Reg. at 61659-60. But the so-called "Grizzly Bear Hunting Regulations" were never voted on or adopted by the Montana Fish, Wildlife, and Parks Commission. Rather, the only mechanism that *was* adopted in Montana was a skeletal "Greater Yellowstone Ecosystem Grizzly Bear Regulation Structure" (the "Structure") – a draft document full of placeholders that was not itself a state regulation. HSUS clarified that the FWS had failed to evaluate whether the Structure constituted an adequate existing regulatory mechanism.

70.     Similarly, the Supplemental Notice relies on a barebones, stopgap "Proclamation" issued by the Idaho Fish and Game Commission as evidence that Idaho had satisfied its regulatory requirements prior to delisting. At the time, Idaho had an open public comment period on its actual grizzly hunting regulations which, having not yet been adopted, could not have been considered to be "existing" or binding as required by the ESA.

71.     Finally, while Wyoming had adopted a substantive regulation that would

         govern a trophy-hunting season, that regulation depended almost entirely

         on a Grizzly Bear Management Plan ("Plan") and the MOA for its content.

         The adoption of the Plan and the MOA were in litigation in state court

         (where HSUS claimed violations of the state administrative procedure law

         through a failure to provide the minimum comment period and advance

         notice of public hearings required by state law). *Laybourn v. Wyo. Game

         and Fish Dep't*, Dkt. No. 186-086 (Wyo. First Judicial Dist., 2016).

72.     HSUS' supplemental comments also argued that while all three states had

         adopted the MOA, the MOA itself was functionally unenforceable and

         inadequate as a post-delisting regulatory mechanism, since it contains no

         penalties for breach; allows for any state signatory to unilaterally withdraw

         from the MOA on 180 days' written notice; includes a provision expressly

         reserving each state's sovereign immunity, likely rendering the parties

         immune from suit in the event of a breach; fails to obligate any funds on

         behalf of any signatory, leaving the financing of the many state monitoring

         and management obligations it imposes uncertain; and allows states

         complete discretion as to the management of grizzly bears *outside* the

         DMA portion of the GYE, allowing for unlimited trophy hunting above and

         beyond the discretionary mortality quotas set by the MOA.

<u>State Rule Litigation & Supplemental Letter to the FWS</u>

73.    Concurrent with the federal delisting process, HSUS filed lawsuits in state

court in Wyoming and Montana challenging the rushed administrative

processes those states used to adopt the regulatory mechanisms the FWS

required at the outset of the federal delisting process.

74.    On June 20, 2017, Plaintiff HSUS sent a letter to the FWS putting the

agency on notice of the current status of the three states' regulatory

mechanisms and positions the states of Wyoming and Montana took in the

state court litigation, and again urging the FWS to not finalize the delisting

rule.

75.    Specifically, by Wyoming's own admission, its core post-delisting

regulatory mechanisms contained within the Grizzly Bear Management

Plan and the MOA are not legally binding, lack the force of law, and may

be freely disregarded by both the public and state wildlife managers

without consequence. *See Laybourn v. Wyo. Game and Fish Dep't*, Dkt.

No. 186-086 (Wyo. First Judicial Dist., June 27, 2017) (holding that the

MOA and the Plan are not "rules" under state law, but are instead

interpretive, internal agency management documents).

76.    While Montana represented that it regards its state grizzly bear regulation

as carrying the force of law, a state court found that this "Greater

Yellowstone Ecosystem Grizzly Bear Regulation Structure" is merely a "placeholder" and a "draft structure proposal, rather than regulations…" *Nagel v. Montana Fish, Wildlife, and Parks*, No. CDV-2016-682 (Mont. Dist. Aug. 22, 2017).

77.     In Idaho, the legislature passed a statute – Idaho S.B. 2017 (signed March 2017, effective July 1, 2017), *amending* I.C. 36-1107 – that newly provided broad authorization to kill grizzly bears in *any* area of the state – including those portions of the PCA and DMA that are in Idaho – for the mere act of "worrying" or "annoying" domestic animals, without any requirement to prefer nonlethal methods. This provision flatly contradicts the Final Draft Conservation Strategy published alongside the Proposed Rule.

78.     The FWS did not respond to Plaintiff's June 20, 2017 letter, nor did the Final Rule address the concerns raised in that letter.

<u>The Statutory Requirements for Delisting Grizzly Bears</u>

<u>Within the DPS Have Not Been Met</u>

79.     Despite significant scientific and legal opposition to the rulemaking, on June 30, 2017, the FWS issued a Final Rule removing federal protection for grizzly bears in the GYE. 82 Fed. Reg. 30502. The Final Rule finalized an unlawful designation of the GYE DPS and failed to correct patent errors in the threats analysis based on the best available science in the record.

80.     Specifically, in the Final Rule the FWS arbitrarily reversed its position on

        the importance of binding state protections, instead asserting without

        explanation that the binding commitments it relied on in both the Proposed

        Rule and the Supplemental Notice, presented in a detailed multi-factor

        chart, were somehow no longer necessary for the ongoing conservation of

        GYE grizzly bears.

81.     Instead, the Final Rule relied on inadequate state regulatory frameworks

        that do not satisfy the factors identified by the FWS as mandatory

        preconditions to delisting, are only preliminary and require further action

        from the states to make final, are not regarded by the states as binding, lack

        the force of law, and/or were under judicial review at the time of federal

        delisting.

82.     The state regulatory frameworks relied on in the Final Rule also

        substantively fail to meet the criterion for delisting. The level of

        recreational hunting allowed by the MOA and state plans would prove

        devastating to GYE grizzly bears. But even if those mechanisms were

        adequate, the Final Rule concedes that they apply only within the DMA,

        the area outside the PCA where grizzly bears will be monitored under the

        Final Conservation Strategy. The DMA constitutes less than half of the

        total grizzly bear range included in the GYE DPS. The Final Rule did not

identify any concrete state regulations or policies in place outside the DMA – indeed, the States have made no commitments of any kind and will be free to allow any amount of direct or indirect mortality in the majority of the habitat included in the DPS.

83.　The Final Rule further failed to supply an evidentiary basis for its conclusion that human-caused mortality will remain flat post-delisting, despite ample record evidence that human caused mortality overall, and specifically poaching, accidental killings, and conflict removals related to livestock depredation, have increased to record levels in recent years – likely as a result of bears' increasing shift to other food sources in the face of decline in whitebark pine, cutthroat trout, and army cutworm moths.

84.　The Final Rule also failed to properly evaluate threats to the survival of the DPS within a significant portion of its range ("SPR"). Despite well-documented threats within the PCA – the core of the proposed DPS – the Final Rule did not analyze the PCA as an SPR of the DPS. This contradicts FWS policy which requires a separate listing factors analysis for portions of the range that provide a "contribution to the viability of the species is so important that, without the members in that portion, the species would be in danger of extinction, or likely to become so in the foreseeable future, throughout all of its range." 82 Fed. Reg. at 30632. Under this definition,

the PCA qualifies as an SPR of the DPS, yet the Final Rule failed to separately address threats within the PCA – where declining food sources, especially whitebark pine and cutthroat – present a particularly dire threat that should have been evaluated separately from the DPS-wide analysis.

85. Finally, the Final Rule deviated substantially from the Proposed Rule, containing dramatic changes to core provisions that were not opened to public comment and are not logically connected to the content of the Proposed Rule. For instance, the Final Conservation Strategy, referred to throughout the Final Rule as the bedrock framework for post-delisting grizzly management and heavily relied upon in the FWS' evaluation of every listing factor in the Final Rule, was not published or adopted until December 2016 – after the close of comments on both the Proposed Rule and the Supplemental Notice. But the Final Conservation Strategy contains major differences from the Draft Conservation Strategy on such fundamental issues as the use of lethal control as a response to bear-human conflicts, and commitments to connectivity between the GYE ecosystem and other grizzly bear populations.

86. Therefore, on June 30, 2017 – the same day that the Final Rule was issued – Plaintiffs sent Defendants notice of their intention to commence this

lawsuit in 60 days if Defendants failed to take action to rescind the delisting rule.

87.   On August 23, 2017, Defendants sent Plaintiffs a letter baldly asserting that the FWS made a finding that the DPS no longer qualified for federal protections, refusing to rescind the Final Rule as requested by Plaintiffs.

## CLAIMS FOR RELIEF

## COUNT I

**(Violation of the ESA and APA – DPS Designation and DPS Boundaries)**

88.   Plaintiffs restate and incorporate the prior allegations in this Complaint.

89.   The ESA seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

90.   Congress amended the ESA in 1979 to allow action to be taken to increase protection for "distinct population segments" before such protection was necessary on a broader scale. Congress contemplated this DPS provision as being used exclusively to *provide* ESA protections to discrete and particularly imperiled populations, and did not intend for it to be used for *removing* protections. *See, e.g.* S. Rep. No. 96-151, at 6-7 (1979).

91.     The DPS Policy was developed to implement the DPS provision in light of

        the ESA's conservation mandate, and to this end provides that DPSs be

        designated "to protect and conserve species and the ecosystems upon which

        they depend before large-scale decline occurs that would necessitate listing

        a species or subspecies throughout its entire range." 61 Fed. Reg. at 4,725.

        The DPS Policy emphasizes that "[i]t is important in light of the Act's

        requirement to use the best available scientific information in determining

        the status of species that this interpretation [of the meaning of a DPS]

        follows sound biological principles" and, necessarily, "[a]ny interpretation

        adopted should also be aimed at carrying out the purposes of the Act." *Id.*

        at 4,722.

92.     The FWS' Final Rule designating GYE grizzly bears as a DPS and

        stripping that DPS of protections under the ESA violates the ESA and DPS

        policy both substantively and procedurally.

93.     First, by failing to evaluate the recovery of all grizzly bears protected

        through the existing listing, and instead narrowing its inquiry to the

        recovery status of just one population within that existing listed entity, the

        Service has unlawfully ignored the impacts to the remainder of the listed

        subspecies caused by delisting the GYE DPS.

94.     Second, the FWS has failed to evaluate the resulting legal status of the

        remnant population of grizzlies, which no longer constitute a listable entity

        (*i.e.*, a species, subspecies, or a DPS) under the ESA now that the GYE

        population has been excluded.

95.     Third, the FWS violated the ESA by simultaneously designating and

        delisting the GYE DPS, in violation of the purpose of the DPS provision as

        added to the ESA in 1979.

96.     Finally, the boundaries of the GYE DPS were drawn arbitrarily and

        capriciously. The DPS includes a massive area around the DMA that,

        according to the FWS's own habitat analysis, is not considered suitable

        habitat for grizzly bears and is not currently occupied by grizzly bears. Yet

        this zone – which comprises roughly seventy-six percent of the total area of

        the DPS – was included in the DPS boundary despite its alleged

        unimportance and unsuitability for the GYE population. While the DPS

        Policy allows the FWS to use imprecise boundaries like highways to

        clearly identify DPS boundaries, the marginal convenience of using

        highways as boundaries does not justify sweeping these "large areas of

        unsuitable habitat" into the DPS – especially when doing so means

        removing the same land from the area covered by the existing "threatened"

        listing. 82 Fed. Reg. at 30517.

97.     The Final Rule is therefore arbitrary and capricious, and otherwise contrary
        to the ESA, 16 U.S.C. §§ 1531(b), 1533, the DPS policy, and the APA, 5
        U.S.C. § 706(2), and must be set aside.

## COUNT II

## (Violation of the ESA and APA – Improper Analysis of Threats to Grizzly Survival)

98.     Plaintiffs restate and incorporate the prior allegations in this Complaint.

99.     Section 4(a) of the ESA sets forth a five-factor test for determining whether
        a "species" is threatened or endangered across all or a significant portion of
        its range. 16 U.S.C. § 1533(a). A species has not recovered, and cannot be
        delisted until the threats to the species as analyzed under section 4(a)(1) of
        the Act have been removed. 50 C.F.R. § 424.11(d).

100.    The FWS failed to base its delisting decision on the best available science
        when evaluating the threats of habitat loss and modification and human
        caused mortality.

101.    First, the FWS repeated the same error it did in its 2007 delisting effort by
        ignoring copious evidence that the ongoing decline in whitebark pine in the
        GYE continues to threaten the survival of grizzly bears, making incorrect
        assumptions about what new evidence of diet plasticity and ranging
        patterns mean for the species' survival and contradicting the best available

science in the record. Specifically, the FWS failed to acknowledge the risk that the shift away from whitebark pine to meat and other food sources, and the attendant spike in human-bear conflict and human-caused mortality, poses to the population.

102. Second, the FWS ignored the best available science showing that climate change is currently, and will continue to, threaten the survival of grizzly bears in the GYE, ignoring the best available science on the impact that climate change will have on grizzly bear food sources and the cascading threats grizzly bears will face as they are increasingly forced to migrate outside of the PCA to find food.

103. Third, the FWS ignored the best available science showing that human-caused mortality is currently, and will continue to, threaten the survival of grizzly bears in the GYE, wrongly concluding, in contravention of record evidence regarding poaching rates and accidental killings, that human-caused mortality (which is responsible for more than sixty percent of grizzly bear deaths since 2002, and more than ninety percent since 2015) will remain flat post-delisting.

104. On this point, the FWS declined to even consider the record-breaking 2015 and 2016 human-caused mortality statistics, despite possessing them well before the publication of the Final Rule. Instead the FWS states, without

warrant, that "2002-2014 [data]…represents the most recent and best available information on the subject." 82 Fed. Reg. at 30,527. In fact, data from 2002 to 2014 is neither the best nor the most recent information on the subject, because data from 2015 and 2016 from the exact same U.S. Geological Survey source have been available for all or most of the rulemaking process.

105. Finally, the ESA Section 4 factors must be analyzed throughout "all or a significant portion of" the range of the listing entity. 16 U.S.C. § 1532(6), (20). But the FWS failed to conduct a separate analysis of the threats that grizzly bears face in the PCA, which constitutes a significant portion of its range within the GYE DPS and within which the loss of staple food sources, climate change, and other threats affect the population more severely than elsewhere within the DPS.

106. The Final Rule is therefore arbitrary, capricious, an abuse of discretion, and is otherwise contrary to the ESA, 16 U.S.C. § 1533, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## COUNT III

## (Violation of the ESA and APA – Failure to Ensure Adequate Regulatory Mechanisms)

107. Plaintiffs restate and incorporate the prior allegations in this Complaint.

108. Section 4(a) of the ESA allows a species to be listed solely on the basis of "the inadequacy of existing regulatory mechanisms," 16 U.S.C. § 1533(a)(1)(D), and a species cannot be delisted until adequate regulatory measures exist to protect the species and ensure its long-term survival once federal protections are removed.

109. In delisting grizzly bears in the GYE, the FWS improperly determined that grizzly bears are not endangered or threatened because adequate state regulatory mechanisms exist. To the contrary, the record shows that the Tri-state MOA entered into by Wyoming, Montana, and Idaho is not binding and authorizes unsustainable trophy hunting that would result in a population crash in the GYE DPS.

110. The FWS also incorrectly concluded that the frameworks adopted by Wyoming, Montana, and Idaho under state law constitute adequate regulatory mechanisms justifying delisting. The Final Rule fails to address the fact that Wyoming's formal legal position is that neither its Grizzly Bear Management Plan nor the MOA has any legal effect; that Montana's framework was, at the time, being challenged in state court as violating statutory and constitutional processes and has since been declared a mere "placeholder"; and that Idaho has adopted a statute that allows for wanton killing of grizzly bears. And the FWS failed to even evaluate the existence

of protective measures for grizzly bears outside of the DMA, which is the majority of the DPS by area.

111.    Finally, the FWS abandoned, without rationale, its position in the Proposed Rule and Supplemental Notice regarding the necessary level of state protections that would need to be in place to satisfy Section 4(a)(1)(D) of the ESA and allow delisting to proceed. While the Proposed Rule stated unequivocally that specific "regulatory mechanism[s]…that would govern potential hunting seasons must be in place by law and regulation in each State for delisting to occur," in a form that is "legally binding" and "enforceable," 81 Fed. Reg. at 13210-11, the Final Rule arbitrarily jettisoned this position and instead found significantly less stringent state mechanisms sufficient.

112.    The Final Rule is therefore arbitrary, capricious, an abuse of discretion, and is otherwise contrary to the ESA, 16 U.S.C. § 1533, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## COUNT IV

### (Violation of the APA – Final Rule Not a Logical Outgrowth of Proposed Rule, Lack of Notice and Comment on Critical Elements of the Final Rule)

113.    Plaintiffs restate and incorporate the prior allegations in this Complaint.

114.   The APA forbids the adoption of Final Rules that contain such significant changes unless supplemental notice and opportunity to comment is provided. 5 U.S.C. § 706. *See also Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) (applying "logical outgrowth" doctrine to vacate final rule that significantly deviated from proposed rule without notice); *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 851 (9th Cir. 2003). But no such opportunity for comment was made available here – an especially significant failure because the Final Rule was adopted more than sixteen months after the publication of the Proposed Rule, and more than one year after the close of public comments on the Proposed Rule, giving the FWS ample time to solicit the legally required public comment on these changes.

115.   The Final Rule is not a logical outgrowth of the Proposed Rule, as the Final Rule includes a Final Conservation Strategy that was never subjected to notice and comment even though it includes substantial changes to the post-delisting management goals and commitments.

116.   The Final Rule is also not a logical outgrowth of the Proposed Rule because it jettisoned nearly wholesale the Proposed Rule's representation – as reaffirmed in the Supplemental Notice - that delisting would not occur

without concrete, binding legal protections in place in each of the three GYE states.

117.    The Final Rule is therefore arbitrary, capricious, an abuse of discretion, fails to use the best available science, and is otherwise contrary to the ESA, 16 U.S.C. § 1533, and the APA, 5 U.S.C. § 706(2), and must be set aside.

## RELIEF REQUESTED

WHEREFORE, plaintiffs request the following relief:

118.    A declaration that the FWS violated the ESA and its implementing regulations, the FWS' own DPS policy, and the APA; and that the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

119.    An order vacating the Final Rule;

120.    An order that plaintiffs recover their costs, including reasonable attorneys' fees, incurred in connection with this action, as provided for under the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412(d), or other applicable law; and

121.    Such other relief as this Court deems necessary and proper.

Date:  August 29, 2017                    Respectfully submitted,


                                          */s/ Kristine M. Akland*
                                          Kristine M. Akland
                                          Akland Law Firm, PLLC

                              Nicholas Arrivo (*pro hac vice application pending*)
                                 The Humane Society of the United States

                                          Attorneys for Plaintiffs